# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

RICHMOND & DANVILLE RAILWAY CO. v. YEAMANS.

APRIL 17th, 1890.

1. COMMON LAW PRACTICE—*Instructions.*—Instructions propounding abstract questions of law but not predicated upon any evidence in the case, or which presuppose a condition of facts not supported by the evidence, are erroneous.

2. NEGLIGENT INJURIES—*Presumptions.*—In trial of action for negligent injuries, negligence must be proved; and it is error to instruct the jury that plaintiff is not bound to do more by his proof than to raise " a reasonable presumption of negligence" on defendant's part, to entitle him to recover.

3. IDEM—*Contributory negligence—Rule.*—It is also error in such actions to instruct the jury that, if plaintiff contributed to the injury, his right to recover is not affected thereby, unless he was in fault in so contributing to the injury, the true rule of contributory negligence being that laid down in *Dun* v. *Seaboard & Roanoke R. R. Co.*, 78 Va., 645.

4. IDEM—*Modification.*—In such action, it is error to modify a proper instruction as to the effect of plaintiff's contributory negligence upon his right of recovery, by inserting in the following provisory clause, "unless the perilous position of plaintiff was known to defendant's employees, and that by use of ordinary care, after knowledge thereof, the accident could have been avoided," the words, " *or by use of ordinary diligence could have been known.*"

5. CASE AT BAR—*New trial.*—Where a plaintiff, acquainted with a crossing, and aware that the place was used for shifting cars, was seen by engineer of the shifter, that had just passed, to drive his one-horse wagon safely across the track within a few feet of the shifter, the horse not noticing it, and to proceed some nine feet from the track, when, the engineer not observing, the horse balked and backed the wagon on to the track into collision with the shifter, which, having coupled onto a train of cars, was backing down the track, whereby injury resulted to wagon, horse and plaintiff, *held*, error to refuse to set aside the verdict for the plaintiff as not warranted by the evidence.

Error to judgment of corporation court of Danville rendered January 15, 1889, in an action of trespass on the case, wherein Thomas B. Yeamans is plaintiff, and the plaintiff in error, the Richmond & Danville railroad company is defendant. Opinion states the case.

*C. M. Blackford,* for the plaintiff in error.

*Guy & Gilliam* and *Peatross & Harris,* for the defendant in error.

FAUNTLEROY, J., delivered the opinion of the court.

The plaintiff in error leases and operates the Virginia Midland railroad, from Washington city to Danville. The road passes southward along the east side of the Dan river through the town of North Danville, and then over a bridge to the right bank of the river into the city of Danville. A county road from Danville towards Halifax county starts from the eastern end of the long wagon-bridge which connects Danville with North Danville, and runs for several hundred yards down the left bank of the Dan river, and between the railroad track and the river; it then bends off from the river to the left, and, after rising a short elevation to the grade of the railroad, it crosses both the main track and the siding (or side track), and then, turning again and rising a slight ascent, runs, for about a hundred feet, nearly parallel with the side track and then turns off from it over a hill. This road and this crossing are in the corporate limits of North Danville, and the place is called Barker's crossing.

On the 17th of May, 1888, Thomas B. Yeamans, who lived a few miles from Danville, in Pittsylvania county, where he had lived on the same plantation all his life, and who was in the habit of coming to Danville frequently by this same road and crossing the railroad ever since it was put there in 1872 or

1873, at Barker's crossing, came up, by this road, in a one-horse wagon, with his son twelve years of age, and a load of tobacco for Danville. Having sold his tobacco, he started back toward his home with his son and the empty wagon about one or two o'clock in the afternoon. He had crossed over the Dan river on the wagon bridge and moved down the Halifax road, by which he had come, until he got to the place where it bends off from the river and starts up the little rise to the railroad crossing. At that point he saw an engine and tender coming down on the side or shifting track towards the crossing. He did not stop, but went on slowly, and the engine and tender passed on across his road only six or eight yards in front of his horse and wagon, and he crossed the track immediately as the engine and tender cleared the road for him. The engine and tender went on beyond the crossing some thirty-five or forty feet, to where there were standing on the siding fifteen or twenty box cars, when it stopped and coupled by its pilot to the box cars, which being done, the yard conductor got down and ran the length of three cars, and uncoupled the third car from the rest of the long train, and then told the brakeman on the end of the car above him to take off the brake and to signal to the engineer to go back; all which being done, the engine, with the tender in front, moved back in the direction of the crossing. In all the time of this operation, both going down to the box cars, and coupling and uncoupling, and signalling, and returning to the crossing, Yeamans, who had crossed over the railroad track immediately as the engine and tender had passed it going down, and was safely over it, had progressed only *nine feet* (as he says), although he was moving all the time, when his horse took fright at the returning engine with the tender in front, and balked and backed his wagon upon the tender, which struck the wagon, broke it to pieces, threw Yeamans and his son out, injured the horse so as to make him valueless, and mashed Yeamans' hand by being trodden upon by the horse, rendering it practically useless, and

otherwise severely hurting him. The boy was not hurt. The engineer saw Yeamans as he approached the crossing with his wagon, without ever pausing, and crossed over the track immediately as the engine passed down, and that his horse was not scared; and he saw Yeamans and his wagon safely over and watched him till he was safely on his way, and, as he supposed, was going up the hill; all this before he started the engine and tender back with the cars which he was shifting. When he started back he was sitting on the same side of the engine which he occupied when going down; but the engine being reversed, he was reversed from the right side going down to the left side coming back. He looked from his seat along the track before he started back, and kept his eye on the track and watched the crossing and the approaches to the crossing as he came back; but he did not see Yeamans or his wagon, and did not know of his being struck until after the accident, he being on the left or far-off side of his engine, and the tender in front cutting off his view of the road over which he had seen Yeamans safely driving towards his destination, after he had safely crossed over the track as the engine and tender was passing down.

The ordinance of the town of North Danville required that any railroad operating in the town should "flag each and every train while crossing any of the public streets or highways." At the time of this accident no flagman was at the crossing. Under these facts the jury gave a verdict in favor of the plaintiff, Yeamans, for $9,000; and the court overruled the motion to set it aside.

The errors assigned are: First, in giving the six instructions asked for by the plaintiff. The first of these instructions, after a very long prelude, instructed the jury that it was the duty of the defendant company in shifting their cars and engines, at this crossing, "to exercise special prudence and caution to avoid doing injury or damage to persons or their property traversing said highway at the point so crossed by the track of

the said railroad, and that any neglect of such precautions as are proper and reasonable under the peculiar surroundings and circumstances of the locality, constitutes negligence for which the said defendant company is liable in damages, unless they further believe from the evidence that the plaintiff, by exercise of ordinary care on his part, could have prevented the injury sustained by him."

This instruction, while it announces a correct proposition of law, is calculated to mislead the jury in this case, because there is no necessary predication in the evidence to call for or to warrant it. An instruction which is merely an abstract proposition of law and sheds no light on the case is properly refused, Judge Richardson says in *Norfolk & Western R. R. Co.* v. *Burge*, 84 Va. (9 Hansbrough); it must, by parity of reason, be error to give such an instruction upon the facts in this case. The evidence does not show any want of special care or prudence or precaution on the part of the employees of the company. The shifting of the cars was not done with speed, and it was properly done at the regular, accustomed and appointed place, and the engineer was on the strict lookout to prevent injury to a passenger on the highway approaching the crossing, over which the plaintiff had passed in safety, and was going on his way homeward before the engine and tender and box cars started back towards the crossing. The highway, though in the corporate limits of North Danville, was only a county road, frequented only to the extent usual for country roads near to the towns.

The second instruction tells the jury that it was the duty of the defendant company to use ordinary care to prevent injury to the plaintiff, and that for failure to exercise such ordinary care, they are liable to the plaintiff in damages for injury sustained by him, unless the plaintiff was guilty of contributory negligence. This is clearly the law, if there was any evidence to show that the defendant company did not use ordinary care. There is none.

The third instruction is: " The court instruct the jury that, while the burden of proof is upon the plaintiff to show negligence in the defendants, in order to entitle him to recover in this action; yet the plaintiff is not bound to do more by his proof than to raise a reasonable presumption of negligence on the part of the defendants, to entitle him to recover." This instruction is not merely calculated to mislead the jury, but it is directly in the teeth of the law. That negligence must be proved; it will not be imputed or presumed. *Rudd* v. *R. & D. R. R. Co.*, 80 Va., (5th Hansbrough,) 549.

What is there to inform the jury what is meant by " a reasonable presumption of negligence "? If juries are to be permitted to presume negligence, and thereupon to mulct defendants in damages, what limit can be put upon their presumptions, and whither will they go ?

The fourth instruction is: " That the plaintiff Yeamans is presumed to have exercised due and proper care at the time at which he was hurt, and that the burden of proving that he was negligent is upon the defendants; and that even if the jury believe from the evidence that the plaintiff contributed to the injury of which he complains, yet his right of recovery is not thereby affected, unless they shall also believe from the evidence that the *plaintiff was in fault* in so contributing to his injury."

This is certainly a new and startling exposition of the law of contributory negligence, and it diametrically inverts the rule that the contributory negligence of the plaintiff will completely bar his right of recovery, unless the *defendants* were in fault—and that, too, only after they discovered the contributory negligence of the plaintiff, and had it in their power to prevent the injurious consequence of the plaintiff's own contributory negligence. If the plaintiff does an act or has a misfortune not caused or induced by the defendant, which is the proximate cause of his injury, that act or misfortune is necessarily *his own*, and the jury has no right to consider the intent,

or to do more than determine the fact of his contributory, negligence; and the question whether the defendant company failed or neglected to prevent or avert the injury to the plaintiff after it saw or knew or became aware of the plaintiff's contributory negligence. See *Richmond & Danville R. R. Co.* v. *Anderson's Adm'r*, 31 Gratt.; *Dun* v. *Seaboard & Roanoke R. R. Co.*, 78 Va. (3 Hansbrough), 645; *Rudd's Adm'r* v. *Richmond & Danville R. R. Co.*, 80 Va., (5 Hansbrough). In the case of *Dun* v. *Seaboard & Roanoke R. R. Co.*, Judge Lacy, after reviewing all the authorities, English and American, upon the doctrine of contributory negligence, says: "It is better, we think, to adhere to the rule, already established in this court, * * * that one who is injured by the mere negligence of another cannot recover any compensation for his injury if he, by his own ordinary negligence or wilful wrong, contributed to produce the injury of which he complains, so that, but for his concurring and co-operating fault, the injury would not have happened to him—except where the direct cause of the injury is the omission of the other party, after becoming aware of the injured party's negligence, to use a proper degree of care to avoid the consequences of such negligence."

The fifth instruction is erroneous, because it presupposes a condition of affairs which the evidence does not support. It instructs the jury that if the employees of the defendant company in charge of the engine knew the character of the crossing and of the highway at that point, and that the plaintiff had driven across the track and was on the highway near the track, then that ordinary care would have required of the defendant other precautions to avoid injury to the plaintiff. This cannot be the law applicable to the facts of this case, as disclosed by the record. The plaintiff drives up to within ten steps of the moving engine on the track without a pause, and crossed the railroad just as the moving tender cleared the way. He saw (or by the use of his eyes he should have seen—the boy with him says that he saw) a long line of fifteen or

twenty box cars standing on the siding, or switch, upon which the engine was moving, only thirty-five or forty feet from the crossing; and, in full view of these, and with a full knowledge and familiarity with the railroad and its shifting operations at that place, and with the road crossing the track and its location and dangers, he crossed, without his horse taking the least notice or concern about the moving train passing immediately in front of his nose; only ten feet from it, and had gone clear of the track, and was steadily moving on his road further and further away from all danger from the crossing. All this the engineer saw and knew. He had seen that the horse was wholly indifferent to the passing train just across his path, in ten feet, and that his driver and master knew this perfect indifference of the horse, and had not even paused, and had crossed the track, just grazing the rear end of the passing train; and he had seen the horse and wagon safely across and beyond the crossing, quietly on their way home. He had a right to consider that all danger to that horse, wagon and driver was passed, and that every step and every moment were increasing the distance and the safety; and that, this being the case, he was not called on to look further after them. He had the right to presume that the horse would *continue to go forward*, and not suddenly backwards, from the phlegmatic behavior which he had exhibited in crossing the track of the railroad. It was the duty of the engineer to dismiss this quietly and safely departing horse, wagon and driver from his solicitude, and to give his whole mind and care to the track and to the safety of the other persons and vehicles on the highway who, in fact, as the evidence shows, were at that time actually approaching the crossing. Suppose Henry Winton—who, as the evidence shows, was at that very moment approaching the crossing, with his vehicle, from the side opposite to the one upon which the plaintiff was going further and further away—had been run over and hurt or killed, would it have been any defense to the charge of negligence, on the part of

the engineer, to have pleaded that he was so intently engaged watching a wagon and horse which had safely and quietly passed over and beyond the danger-point, that he had no time or capacity to look down his track and prevent running over one which was approaching it? Would it not have been (even derisively) said that the man and horse and wagon that had safely crossed over and beyond, and was progressing further and further away, did not need his following gaze and guard; while the man and vehicle about to cross his track at the crossing, needed and was entitled to his whole and undivided attention?

The sixth instruction is not objected to.

The second assignment of error is, the court's modifying the first instruction asked for by the defendant, and rejecting altogether the fourth instruction which it asked for.

The first instruction asked for by the defendant is as follows: " That in order for the plaintiff to recover against the defendant company for the injury complained of, he must prove that the injury was caused by the defendant company, and it must not appear from the evidence that any want of ordinary care and prudence on his part directly contributed to the injury; that when a traveler upon the public highway approaches a railroad crossing, before attempting to cross the track he is bound to use his senses, he is bound to look up and down the track and to listen, so as to inform himself of the movements of cars and engines being used thereon, in order to avoid any possible accident from approaching trains or engines moving up and down the track in the service of the company; and if he fail so to use his senses, but thoughtlessly or blindly goes upon the track and undertakes to cross where trains or engines are passing, such negligence of duty to so use his physical senses, is in law, negligence. Therefore if the jury should believe, from the evidence, that the plaintiff drove upon and across the defendant company's railroad track without looking or listening for approaching trains or passing engines, and

without informing himself of the whereabouts or movements of the shifting engine, which he saw passing when he approached the crossing, or if when he reached the crossing he saw the engine coupling to box cars for the purpose of shifting them from one track to the other, or could have seen it by the exercise of ordinary diligence, and undertook to and did cross the track within a few feet of said engine so engaged in shifting without informing himself as to the direction such engine would move, and after crossing the track proceeded along a public highway with an ascending grade parallel with and in close proximity to the said track on which the said engine was moving, with an embankment on one side and a railroad cut on the other, and while so traveling and ascending said highway the plaintiff's horse became frightened at the approach of the engine and became unmanageable, whereby he ran backward toward the train and precipitated the plaintiff against the train, and plaintiff was injured, then the plaintiff was guilty of contributory negligence and cannot recover, unless the jury should further find from the evidence that the perilous position of the plaintiff was known to the defendant company's employees or agents, and that by the use of ordinary care, after knowledge thereof, the accident could have been avoided." The court modified this instruction by inserting the words, " *or by the use of ordinary diligence could have known,*" near the end of the instruction. This is saying, in effect, that, under no circumstances, can contributory negligence of the plaintiff excuse the defendant; and it utterly destroys the whole doctrine of contributory negligence. The instruction as it was asked for, is sustained by the decisions of this court; and it was error in the corporation court to refuse to give it; and it was greater error still to modify it as aforesaid, and then to give it.

The fourth instruction asked for by the defendant, and refused out and out by the court, stated to the jury that if they believed from the evidence that the engineer, when he started

back with his train, saw that the plaintiff had crossed the track and was proceeding along the highway in the usual manner, in a direction leading away from the track and crossing, and, that having done so, he then devoted his attention to the track and to the crossing, and no longer could see the plaintiff, that there was no legal obligation on him to continue to watch the plaintiff, and thereby divert his attention from the track and the crossing. This instruction merely states the facts in evidence, and a sound proposition of law applicable to them; and it was error to refuse it.

The fifth error assigned is the refusal of the court to set aside the verdict.

The facts of this case show that the injury was the result of one of those unexpected and unavoidable accidents which no wit of man, nor foresight, nor care could have prevented; and they clearly show that there was no negligence upon the part of the defendant which caused the accident. The engineer did all that was in his power, and all that he was called upon to do. He did not see the plaintiff, nor know of the danger into which he was placed by the balking and backing of plaintiff's horse; and he had a right to suppose that a horse which had crossed the track in a few feet of a moving train, just in front of his nose, without the slightest notice of it, and which was then moving homeward, driven by an intelligent master, would continue to move in the direction he was moving, and thus in each step was leaving the danger further behind him; and there was nothing to induce him to suppose or conceive that the horse would *reverse* and back, and continue to back until he backed the wagon against the moving train. The engineer says: 'After Yeamans had crossed, I saw him going up the hill from the crossing, and I thought he was out of all possible danger. There was no possible way in which I could have avoided the accident. I did not see him any more after I saw him some thirty or forty feet past the crossing, until after the accident. I was looking to see that no one got on the track

*in front of me*—the way I was going—and the crossing ahead of me." And the plaintiff himself said, in his testimony: "*If my horse had not backed, I would not have been injured. I had no whip.*"

There was no negligence in the puffing out steam from the shifting engine in the necessary discharge of its action, and no unnecessary escape or discharge of the waste steam was made in this case. The owner and driver of the horse did not fear or anticipate that he would balk; and there was nothing to make the engineer suppose or dream that, having seen him pull up the sharp rise and across and beyond the crossing with indifference to a train passing across his path and under his very nose, he would, when safely on the other side of the track, suddenly change his nature and stolid calmness and balk and back until he brought the wagon against the moving tender. It was a *misfortune* of the plaintiff to have such a horse; but it was not the *fault* of the railroad, which was in the proper, usual and necessary performance of its rightful business. For these reasons, we think the verdict ought to have been set aside; and that the judgment of the corporation court of Danville is wholly erroneous, and must be reversed and annulled.

LEWIS, P., and HINTON, J., dissented.

JUDGMENT REVERSED.